1   DENNIS J. HERRERA, State Bar #139669
    City Attorney
2   WAYNE SNODGRASS, State Bar #148137
    Deputy City Attorney
3   TARA M. STEELEY, State Bar #231775
    Deputy City Attorney
4   City Hall, Room 234
    1 Dr. Carlton B. Goodlett Place
5   San Francisco, California 94102-4682
    Telephone:      (415) 554-4655
6   Facsimile:      (415) 554-4699
    E-Mail:         Tara.Steeley@sfcityatty.org

7

8   Attorneys for Defendant
    MAYOR LONDON BREED, in her official capacity
9   as Mayor of San Francisco

10

11

12                      UNITED STATES DISTRICT COURT

13                    NORTHERN DISTRICT OF CALIFORNIA

14

15   SAN FRANCISCO INTERNATIONAL          Case No. 3:20-cv-07314-JD
     ARTS FESTIVAL, NKECHI EMERUWA,
16                                        **DECLARATION OF TOMÁS ARAGÓN IN
            Plaintiffs,                   SUPPORT OF OPPOSITION TO EX PARTE
17                                        MOTION FOR A TEMPORARY
            vs.                           RESTRAINING ORDER**
18
     MAYOR LONDON BREED, in her official
19   capacity, GOVERNOR GAVIN NEWSOM, in
     his official capacity,
20
            Defendants.

21

22

23

24

25

26

27

28

     DECL. ARAGON ISO OPP. TO TRO
     CASE NO. 3:20-cv-07314-JD

I, Tomás Aragón, declare as follows:

1.      I am a resident of the State of California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to the matters set forth below.

2.      I am the Health Officer of the City and County of San Francisco ("San Francisco") and the Director of the Population Health Division ("PHD") of San Francisco's Department of Public Health ("SFDPH").  I have held both positions since 2010.  I also teach population health data science at the U.C. Berkeley School of Public Health.

3.      As the Health Officer, I exercise leadership and legal authority to protect and promote health throughout San Francisco.  In California, each county is required to appoint a county Health Officer.  Health Officers are charged with the duty to enforce and observe all orders, ordinances, and statutes related to public health.  In the event of an emergency, Health Officers may take preventative measures as may be necessary to protect and preserve the public health from any public health hazard. Health Officers are also authorized to control contagious, infectious, and communicable diseases and take preventative measures as may be necessary to prevent and control the spread of disease.

4.      I received by Bachelor of Arts in Molecular Biology from the University of California, Berkeley in 1983.  I received my medical degree from Harvard Medical School in 1988.  I also received a Master of Public Health (Epidemiology) from Harvard School of Public Health in 1988.  I received my DrPH, Doctor of Public Health (Epidemiology) from University of California, Berkeley School of Public Health, in 2000.

5.      Prior to becoming the Health Officer and Director of PHD, I held various positions within SFDPH from 1996-2010 including Director of Chronic Disease Epidemiology, Director of Community Health Epidemiology and Disease Control, as well as Physician Provider at the Tom Waddell Health Center.  Attached as **Exhibit A** is a true and correct copy of my CV.

## I.      THE COVID-19 PANDEMIC AND PUBLIC HEALTH EMERGENCY

6.      COVID–19 is a novel severe acute illness that, as of this writing, has killed more than 200,000 nationwide and thousands of people in California.  As of September 26, 2020, there were

1

11,238 confirmed cases of COVID-19 in San Francisco as well as at least 101 deaths.  At this time, there is no known cure and no vaccine, although public health experts are optimistic that one or more vaccines will be approved and widely available by sometime in approximately mid-2021.

7.      Symptoms of the virus include fever, difficulty breathing and fatigue, cough, headache, and joint pain.  COVID-19 can lead to pneumonia and ultimately death.  In addition, although COVID-19 is seen as a disease that primarily affects the lungs, it can damage many other organs as well, and may cause long-term health problems. For instance, imaging tests taken months after recovery from COVID-19 have shown lasting damage to the heart muscle, even in people who experienced only mild COVID-19 symptoms. The type of pneumonia often associated with COVID-19 can cause long-standing damage to the tiny air sacs (alveoli) in the lungs. The resulting scar tissue can lead to long-term breathing problems.  Even in young people, COVID-19 can cause strokes, seizures and Guillain-Barre syndrome — a condition that causes temporary paralysis.

8.      COVID-19 spreads easily from person to person.  Among other means of transmission, the virus can be transmitted through tiny aerosolized particles that can travel more than six feet from the nose or mouth of the infected individual, and can remain suspended in the air for a lengthy period of time.  Face coverings and social distancing reduce the risks of such aerosol virus spread, but do not eliminate that risk.  The virus spreads more efficiently indoors, but holding an event outdoors does not eliminate the risk of transmission.

9.      Adding to the risk is the fact that a significant share of infected people remain entirely asymptomatic, but such asymptomatic individuals are just as likely to transmit the virus to others as they would be if they were experiencing symptoms.  Thus, a person who feels well may nonetheless be infected, and may unwittingly infect others.

10.      Limiting gatherings, particularly gatherings of members of multiple households, is an integral part of the containment strategy designed to slow the spread of COVID-19.  When a person avoids unnecessary social gatherings, they are also necessarily separated from others, breaking the chain of transmission.  It is particularly crucial to limit gatherings that involve members of multiple households, because such gatherings can provide a means for the virus to spread from one household

2

DECL. ARAGON ISO OPP. TO TRO
CASE NO. 3:20-cv-07314-JD

to another.  Once one member of a household is infected with COVID-19, it is very difficult to prevent other members of that household from also becoming infected.  Effective containment thus depends on not bringing the virus into the household in the first place.

11.     Even if a person is not sick at the moment, he or she may be infected and contagious without any symptoms and then spread the disease to others.  Planning scenarios published by the CDC estimate that, on average, a person with COVID-19 goes on to infect between 2 and 4 other people, with a best estimate of 2.5 when no preventive measures are taken.[1]  If each infected person spreads the virus to 2 people, who each in turn spread it to 2 others, and so on, that means that after 10 transmission cycles, one person would be responsible for 1,024 other people contracting the virus.  For these reasons, the best ways to reduce the spread of the virus are for people to stay home as much as possible, avoid gatherings, and when they must venture out, wear face coverings and practice social distancing.

12.     Given how the virus spreads, I am concerned that we are entering into a period of time where we face risks of a surge in COVID-19 infections.  As temperatures drop and the rains begin, people tend to spend more time indoors, where the virus spreads more efficiently.  In addition, we are beginning the "holiday season," during which time members of the community have traditionally gathered together indoors for family events and parties and may continue to do so despite the risks.

## II.      SAN FRANCISCO'S HEALTH ORDERS

13.     On March 4, 2020, California's Governor Gavin Newsom proclaimed a "state of emergency" due to the COVID-19 pandemic.  Likewise, on March 6, 2020, I declared a health emergency due to the COVID-19 pandemic and subsequently enacted Health Orders to protect the public health.[2]

---

[1] https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html

[2] Health Orders are enforceable laws and are usually accompanied by one or more Directives, which provide legally binding instructions for how to comply with the Health Order.  Health Orders related to COVID-19 are numbered C19-##. When a number is followed by a lowercase letter, the letter shows that the item has been amended.  So C19-07g was the seventh iteration of Order No. C19-07.

3

DECL. ARAGON ISO OPP. TO TRO
CASE NO. 3:20-cv-07314-JD

1     14.     Initially San Francisco's orders generally required individuals to stay in their residences

2   except for essential needs like grocery shopping, working in essential businesses, providing essential

3   government functions, or engaging in essential travel. Over time, and based on health data and a risk

4   analysis, San Francisco allowed the phased resumption of some businesses and activities, consistent

5   with the roadmap that the State has established under its order. For instance, San Francisco allowed

6   businesses that had operated primarily outdoors before March 16, 2020, to resume outdoor business

7   activities, and the County has allowed many outdoor recreation activities that do not involve physical

8   contact or shared equipment. More recently, San Francisco has allowed additional categories of

9   businesses and activities to resume, such as outdoor dining, curbside pick-up, and in-store retail, with

10   other businesses and activities to be added over time.

11     15.     Also, as part of San Francisco's phased reopening plan, San Francisco now allows

12   "outdoor gatherings among people from more than one Household for religious services or religious

13   ceremonies and for political protests and involving no more than 200 people total" under certain

14   conditions.  Those conditions include (but are not limited to) that the event "conclude in no more than

15   two hours," and that participants cannot "move among simultaneously occurring Outdoor Gatherings

16   or switch places with Participants in other simultaneously occurring Outdoor Gatherings".  In addition,

17   "[p]articipants are strongly discouraged from attending more than one Outdoor Gathering per day, and

18   should not attend more than two Outdoor Gatherings per week."  This is because the more contacts a

19   person has with others, including during Outdoor Gatherings, the more they are placing themselves

20   and others at risk of transmitting the virus.  Singing, chanting, shouting and playing wind or brass

21   instruments – all of which significantly increase the amount of viral particles a person expels,

22   including in the form of aerosols – are allowed at these special outdoor gatherings only if: (1) only one

23   person is singing, chanting, shouting and playing wind or brass instruments at a time; (2) the person

24   performing the activity is at least 12 feet from any other person; (3) the person singing, chanting, or

25   shouting is wearing a Face Covering at all times; (4) the instrument's bells and/or openings where

26   air/sound exit are covered with a mask/other fabric at all times; and, (5) "Participants are not

27   encouraged to sing, chant, or shout along with the person who is engaging in that activity."  Attached

28

4

DECL. ARAGON ISO OPP. TO TRO
CASE NO. 3:20-cv-07314-JD

1    as **Exhibit B** is a true and correct copy of the City's current Directive concerning Outdoor Gatherings.

2    The Directive is also available at https://www.sfdph.org/dph/alerts/files/Directive-2020-19-Outdoor-

3    Gatherings.pdf.

4          16.    Except where allowed by other sector-specific health orders, the State generally

5    prohibits private gatherings that include more than three households.  Similarly, San Francisco restricts

6    in-person gatherings to no more than 12 people.  Where multiple gatherings are occurring in an

7    outdoor space, mixing between group gatherings is not allowed.  A true and correct copy of San

8    Francisco Health Order concerning gatherings is attached hereto as **Exhibit C.**  A true and correct

9    copy of the State of California's Guidance for Private Gatherings is attached as **Exhibit D,** and is also

10   available at https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/CDPH-Guidance-for-

11   the-Prevention-of-COVID-19-Transmission-for-Gatherings-10-09.aspx.

12   **III.    PLAINTIFFS' FESTIVAL, AS CURRENTLY DESIGNED, POSES AN
         UNNECESSARY HEALTH AND SAFETY RISK TO THE PEOPLE OF SAN
13       FRANCISCO.**

14         17.    I understand that Plaintiffs plan to hold a festival with 11-12 artistic events per day in

15   the Fort Mason Area.  Plaintiffs have said that they will cap the number of people in the live audience

16   at 49 people per event.  If 11-12 events occur each day, each with 49 people attending, the San

17   Francisco International Arts Festival would bring up to 539-588 people per day to Fort Mason.  I have

18   concluded that a mass gathering of that size would unnecessarily increase the risk of COVID-19

19   transmission in San Francisco.

20         18.    I understand that Plaintiffs contend that their festival is irrationally treated differently

21   from other events in San Francisco, such as outdoor religious services and political protests.  That is

22   incorrect.  Since beginning Shelter in Place Requirements, San Francisco's Health Orders have never

23   permitted an event such as Plaintiffs to take place.  Plaintiffs plan to hold an event that could bring up

24   to 588 people each day to their festival.  See https://www.sfiaf.org/october_2020_program_list.

25   Outdoor Religious events and political protests are capped at no more than 200 people.  No larger

26   gatherings are permitted in San Francisco.  Plaintiffs are planning to hold a multi-stage arts festival

27   that lasts over five hours each day, while all permitted outdoor gatherings (including religious events

28
                                                5
        DECL. ARAGON ISO OPP. TO TRO
        CASE NO. 3:20-cv-07314-JD

1    and political protests) can last no longer than two hours.  My understanding is that Plaintiff San

2    Francisco International Arts Festival is planning to hold an arts festival, that includes theater

3    performances, singing performances, and performances from bands that include singers and musicians

4    that play wind instruments.  Simply breathing creates aerosols.  Talking spreads more.  Shouting or

5    talking at loud volumes spreads more.  Singing and playing wind instruments spread the most.

6    Therefore, San Francisco does not allow singing or wind instrument performances at any events

7    (whether it is a religious service, political protests or other event) unless: (1) only one person is

8    singing, chanting, shouting and playing wind or brass instruments at a time; (2) the person performing

9    the activity is at least 12 feet from any other person; (3) the person singing, chanting, or shouting is

10   wearing a Face Covering at all times; (4) the instrument's bells and/or openings where air/sound exit

11   are covered with a mask/other fabric at all times; and, (5) participants are not encouraged to sing,

12   chant, or shout along with the person who is engaging in that activity.  Further, the festival nature of

13   Plaintiffs' event encourages audience members to attend multiple performances throughout the event,

14   and Plaintiffs intend to have performances on multiple stages simultaneously.  But, for the outdoor

15   events allowed in San Francisco, participants are not permitted to move among simultaneously

16   occurring Outdoor Gatherings or switch places with Participants in other simultaneously occurring

17   Outdoor Gatherings.  Likewise, mixing between group gatherings is not allowed.

18          19.     These restrictions are important.  San Francisco limits events to two hours long

19   because, the longer the event, the more risk there is of people mingling and spreading the virus.  San

20   Francisco limits when persons can sing, chant, shout and play wind instruments in public because of

21   the increased risk of spreading the virus that those activities create. San Francisco does not allow

22   persons to move between simultaneously occurring outdoor gatherings because of the increased risk of

23   spreading the virus when people mingle between groups.

24          20.     I understand that Plaintiff San Francisco International Arts Festival has taken steps to

25   promote social distancing at the festival, and to reduce the risk of transmission of the virus.  However,

26   any time there is a gathering of people, there is a risk of spreading COVID-19.  Further, gatherings

27   cause risks for spreading the virus that are outside of the control of the organizers of the event.

28

6

DECL. ARAGON ISO OPP. TO TRO
CASE NO. 3:20-cv-07314-JD

1   Persons attending gatherings in San Francisco need to travel to the event, and may do so through mass

2   transit, carpooling with persons outside their household, ride share options, and other means that create

3   risks of spreading the virus.  Organizers cannot guarantee that persons who attend the event only sit

4   with and interact with members of their household.  Persons who attend public events will need to use

5   bathrooms, which are indoor, enclosed spaces where the virus can spread easily.

6          21.     I am also concerned that, if I allow Plaintiffs' event, I also would have to allow other

7   similar events.  The risks posed by a single 588-person event are already substantial.  But the risks

8   posed by numerous similarly sized events are far greater, and would likely be catastrophic for San

9   Francisco's efforts to control the spread of COVID-19.

10          22.     I understand that the closing/cancellation of any business, activity, or event not

11   permitted under San Francisco's Health Orders will likely have an impact upon those in the

12   community.  I look forward to being able to allow events such as Plaintiffs in person, hopefully by the

13   spring or summer.  At this time, however, the risk of Plaintiff's event is simply too high. While

14   societal impacts are regrettable and should be minimized where possible, they must always yield to

15   public health concerns where a serious and demonstrable threat to the public exists as it does here.

16   The hard-won successes we have had in controlling the virus' spread in San Francisco are very fragile.

17   We as a society must continue to sacrifice together to minimize the spread of COVID-19 to protect

18   human life and health.

19          I declare under penalty of perjury under the laws of the United States of America that

20   the foregoing is true and correct.  Executed this 20th day of October, 2020, in San Francisco,

21   California.

22

23   _____
                              TOMÁS ARAGÓN, MD, DrPH

24

25

26

27

28

                                                   7

DECL. ARAGON ISO OPP. TO TRO
CASE NO. 3:20-cv-07314-JD